Affirmed by published opinion. Judge MICHAEL wrote the opinion, in which Judge RUSSELL and Judge MOTZ joined.
 

 OPINION
 

 MICHAEL, Circdt Judge:
 

 Here we must decide whether 11 U.S.C. § 1322(c)(2), enacted as part of the Bankruptcy Reform Act of 1994, allows Chapter 13 debtors to bifurcate undersecured home mortgage loans into separate secured and unsecured claims. Before § 1322(e)(2) was enacted, the Supreme Court in
 
 Nobelman v. American Savings Bank,
 
 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), held that another provision, § 1322(b)(2), prodbited a Chapter 13 debtor from bifurcating home mortgage debt. In their proposed Chapter 13 plan in tds case, debtors Clarence Gordon Witt and Carolyn Sue Witt bifurcated their home mortgage debt owed to Udted Compames Lending Corporation (Udted). When Udted objected to confirmation of the plan, the Witts argued that § 1322(c)(2) should be interpreted to overrde
 
 Nobelman
 
 and permit bifurcation. The bankruptcy court agreed with the Witts and overraled Udted’s objection, but the district court reversed. We agree with the district court that § 1322(c)(2) does not allow bifurcation.
 

 I.
 

 On April 13, 1995, the Witts filed their petition for relief under Chapter 13 of the Bankruptcy Code, 11 U.S.C. §§ 1301
 
 et seq.
 
 Their principal debt was $22,561.02 due to Udted on a note executed September 15, 1989, wHch matures in 1999. The note was secured by a first deed of trust on the Witts’ ody residence, a mobile home and lot located in Appomattox County, Virgida. According to the Witts, the current fair market value of their home is $13,100. In their proposed Chapter 13 plan the Witts bifurcated the obligation to Udted into two claims, one secured and one unsecured. The $13,100 secured claim (representing the value of Udted’s interest in the home) wodd be paid out in full over five years, beginning Jdy 1, 1995. Interest at ten per cent per annum wodd be paid on the secured claim. The rest ($9,461.02) of the obligation to Udted
 
 *510
 
 would be unsecured. In their plan the Witts propose to pay only 30 percent of each allowed unsecured claim.
 

 United objected to the Witts’ plan, claiming that the bifurcation of its claim modified its rights under the secured note in violation of 11 U.S.C. § 1322(b)(2). The bankruptcy court, however, overruled United’s objection by deciding that 11 U.S.C. § 1322(c)(2) created an exception to § 1322(b)(2)’s prohibition against bifurcation of home mortgage debt. On appeal the district court reversed and remanded.
 
 United Companies Lending Corp. v. Witt,
 
 199 B.R. 890, 895 (W.D.Va.1996). Concluding that § 1322(e)(2) did not permit bifurcation, the district court reversed the bankruptcy court’s determination to the contrary and also remanded the case for a hearing on whether the extension of the plan beyond three years was justified under 11 U.S.C. § 1322(d). The Witts appeal only the district court’s reversal on the bifurcation issue.
 

 II.
 

 The Witts’ Chapter 13 plan bifurcates United’s claim into secured and unsecured components even though the underlying note was entirely secured by a first deed of trust on the Witts’ home. Bifurcation is generally permitted under 11 U.S.C. § 506(a), which states:
 

 An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor’s interest ... and is an unsecured claim to the extent that the value of such creditor’s interest ... is less than the amount of such allowed claim.
 

 However, in
 
 Nobelman v. American Savings Bank,
 
 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), the Supreme Court held that § 506(a) did not apply to claims that were secured only by an interest in the debt- or’s principal residence. To reach this result, the Court looked to 11 U.S.C. § 1322(b)(2), which provides that a Chapter 13 plan may “modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor’s principal residence.” The Court held that “to give effect to § 506(a)’s valuation and bifurcation of secured claims through a Chapter 13 plan ... would require a modification of the rights of the holder of the security interest.”
 
 Id.
 
 at 332, 113 S.Ct. at 2111. According to the Court, “[sjection 1322(b)(2) prohibits such a modification where, as here, the lender’s claim is secured only by a lien on the debt- or’s principal residence.”
 
 Id.
 

 The Witts readily admit that their plan’s proposed bifurcation is similar in all relevant respects to the one proposed in
 
 Nobelman
 
 and would therefore be barred under
 
 Nobelman
 
 if that decision still controls. However, subsequent to
 
 Nobelman
 
 Congress passed the Bankruptcy Reform Act of 1994. Section 301 of the Act amended 11 U.S.C. § 1322 to add subsection (c), which states in relevant part:
 

 Notwithstanding subsection (b)(2) and applicable nonbankruptcy law — ...
 

 (2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor’s principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.
 

 11 U.S.C. § 1322(c)(2). Both sides agree that the Witts’ plan meets the condition that “the last payment on the original payment schedule” be due “before the date on which the final payment under the plan is due.”
 
 [1]
 
 Since the Witts’ plan meets this condition, their plan “may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.”
 

 
 *511
 
 The parties differ, however, over whether the phrase “as modified pursuant to section 1325(a)(5)” should be read as applying to “claim” or “payment.” The Witts argue that the phrase should be interpreted to apply to “claim.” This interpretation would allow the Witts to “modiffy]” United’s “claim” pursuant to § 1325(a)(5), which (the Witts say) permits bifurcation.
 
 [2]
 
 United contends, however, that the phrase “as modified pursuant to § 1325(a)(5)” should be read as applying to “payment” rather than “claim.” This interpretation would only permit the Witts to “modiffy]” the amount or scheduling of the individual payments on the claim; the amount of the underlying claim itself could not be modified.
 
 [3]
 
 The district court agreed with United.
 
 See Witt,
 
 199 B.R. at 893 (“Section 1322(c)(2) says that payment of the claim may be modified pursuant to § 1325(a)(5), not that the entire claim could be modified according to § 506(a) as the Witts suggest.”). We review the district court’s interpretation of the statute
 
 de novo. United States v. Childress,
 
 104 F.3d 47, 50 (4th Cir.1996).
 

 In interpreting § 1322(c)(2), we begin by examining the text of the statute. As we recognized in
 
 United States v. Sheek,
 
 990 F.2d 150, 152-53 (4th Cir.1993), “[statutory construction must begin with the language of the statute and the court should not look beyond that language unless there is ambiguity or unless the statute as literally read would contravene the unambiguously expressed legislative intent gleaned from the statute’s legislative history.” Unfortunately, we find the language of § 1322(e)(2) — “payment of the claim as modified” — to be ambiguous. It cannot be determined, merely from the statute’s text, whether the words “as modified” should apply to “payment” or to “claim.”
 

 We recognize that under the “rule of the last antecedent,” a phrase should be read to modify its immediate antecedent.
 
 See Nobelman,
 
 508 U.S. at 330, 113 S.Ct. at 2111. According to this rule, the phrase “as modified” would apply to its immediate antecedent, “claim.” However, although this reading may be “quite sensible as a matter of grammar,” we find, as did the
 
 Nobelman
 
 Court (in interpreting another section, § 1322(b)(2)), that such a reading “is not compelled.”
 
 Id.
 
 In the section we must interpret, § 1322(c)(2), the term “claim” is part of the phrase “of the claim,” which modifies “payment.” It is quite plausible as a matter of common sense, we believe, that the phrase “as modified” also modifies “payment” and not “claim.” After all, the subject of payment is the focus of § 1322(c)(2); it only deals with plan payment provisions when “the last
 
 payment
 
 on the original
 
 payment
 
 schedule” on a home mortgage loan “is due before the date on which the final
 
 payment
 
 under the plan is due.”
 

 Moreover, in the final clause of § 1322(c)(2) (“the plan may provide for the
 
 payment
 
 of the claim as modified”) the word “payment” becomes superfluous if the Witts’ interpretation is adopted. According to their interpretation, “as modified” can only be read as applying to “claim,” and “payment” is left unmodified. If Congress had intended this reading, however, there was no need for it to talk about the “payment” of the claim. Instead, it could have simply ended
 
 *512
 
 § 1322(e)(2) by saying “the plan may provide for the claim to be modified.” But Congress said something else in the last clause of § 1322(c)(2), that is, “the plan may provide for the
 
 payment
 
 of the claim as modified.” Under the Witts’ interpretation, this reference to “payment” becomes wholly unnecessary and superfluous. As the Supreme Court counseled in
 
 Connecticut Nat’l Bank v. Germain,
 
 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992), “courts should disfavor interpretations of stat utes that render language superfluous.”
 

 The legislative history provides further support for the interpretation that only payment may be modified.
 
 See Green v. Bock Laundry Machine Co.,
 
 490 U.S. 504, 511, 109 S.Ct. 1981, 1985, 104 L.Ed.2d 557 (1989) (“Because the plain text does not resolve these issues, we must examine the history leading to enactment____”). Although both the Senate and the House were working on similar bills to reform the Bankruptcy Code in the 103rd Congress, it was the House bill that eventually became the Bankruptcy Reform Act of 1994. In House Report 835, the House Committee on the Judiciary set forth the purpose of the Act and also set forth individual analyses of each section. The Report notes in the “Summary and Purpose” section that among the problems addressed by the Act were “a number of problematic court opinions construing the Bankruptcy Code.” H.R.Rep. No. 103-835, at 32 (1994),
 
 reprinted in
 
 1994 U.S.C.C.A.N. 3340, 3341 (hereinafter
 
 Report ).
 
 The Report states that the Act “addresses the most pressing of these problems in a moderate and carefully balanced fashion.”
 
 Id.
 
 In summarizing some of the proposed solutions, the Report notes that the Act “makes several changes pertaining to consumer bankruptcies, including strengthening a debtor’s right to cure a home mortgage default in a chapter 13 plan.”
 
 Id.
 
 at 34.
 

 The Report also includes a separate section explaining § 301 of the Act, codified at 11 U.S.C. § 1322(c). This section, entitled “Period for curing default relating to principal residence,” first discusses the changes made by the addition of § 1322(c)(1). The Report says that § 301 “allow[s] the debtor to cure home mortgage defaults at least through the completion of a foreclosure sale under applicable nonbankruptcy law.”
 
 Id.
 
 at 52. According to the Report, § 1322(c)(1) was meant to overrule
 
 Matter of Roach,
 
 824 F.2d 1370 (3d Cir.1987), which held that the right to cure was extinguished after the issuance of a foreclosure judgment. The Report then discusses the impact of the section we must interpret in this ease, § 1322(c)(2):
 

 The changes made to this section, in conjunction with those made in section 305 of this bill, would also overrule the result in
 
 First National Fidelity Corp. v. Perry,
 
 945 F.2d 61 (3d Cir.1991) with respect to mortgages on which the last payment on the original payment schedule is due before the date on which the final payment under the plan is due. In that case, the Third Circuit held that subsequent to foreclo sure judgment, a chapter 13 debtor cannot provide for a mortgage debt by paying the full amount of the allowed secured claim in accordance with Bankruptcy Code section 1325(a)(5), because doing so would constitute an impermissible modification of the mortgage holder’s right to immediate payment under section 1322(b)(2) of the Bankruptcy Code.
 

 Report
 
 at 52. This passage makes clear Congress’s intent in enacting § 1322(c)(2). Under
 
 Perry
 
 a Chapter 13 debtor could not “provide for a mortgage debt by paying the full amount of the allowed secured claim” through a bankruptcy plan if the creditor had previously obtained a foreclosure judgment. Instead, the creditor was entitled to “immediate payment” because § 1322(b)(2) did not permit any modification of the mortgage holder’s rights. Section 1322(c)(2), however, “overruled”
 
 Perry
 
 and allows for payment of the full amount over time. Thus, § 1322(c)(2) was only intended to allow payments to be stretched out over time; the debtor is still required to pay the “full amount of the allowed secured claim.”
 
 [4]
 

 Report
 
 at 52.
 

 
 *513
 
 The Report is also instructive for what it does not say. It makes no mention of the
 
 Nobelman
 
 decision or of any intention to overrule that decision. The Witts’ interpretation of the statute, however, would directly overrule Nobelman.
 
 [5]
 
 Had Congress intended to overrule
 
 Nobelman,
 
 we expect Congress would have discussed that in the legislative history. Although the Report directly refers to forty cases, including three Supreme Court cases, that the Act was intended to overrule,
 
 Nobelman
 
 is not one of them.
 
 [6]
 
 The Witts offer no reason why Congress would have failed to include
 
 Nobelman
 
 in this list if it was actually overruled by § 1322(c)(2).
 

 “It is firmly entrenched that Congress is presumed to enact legislation with knowledge of the law.”
 
 United States v. Langley,
 
 62 F.3d 602, 605 (4th Cir.1995) (en banc),
 
 cert. denied,
 
 — U.S. —, 116 S.Ct. 797, 133 L.Ed.2d 745 (1996). The upshot of this canon of statutory interpretation is that “absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction.”
 
 Id.
 
 (quoting
 
 Estate of Wood v. C.I.R.,
 
 909 F.2d 1155, 1160 (8th Cir.1990) (quoting
 
 Johnson v. First Nat’l Bank of Montevideo,
 
 719 F.2d 270, 277 (8th Cir.1983))). Congress certainly intended the Bankruptcy Reform Act of 1994 to overrule judicial precedent in a number of different areas. There is no “clear manifestation,” however, that Congress intended to overrule
 
 Nobelman.
 
 We believe it ill-advised to give such a drastic interpretation to § 1322(c)(2) without congressional support. As we said in
 
 Langley,
 
 “[i]f Congress intended such a revolutionary change in the law, ... it would have made clear its intention to do so.”
 
 Langley,
 
 62 F.3d at 606;
 
 cf. Dewsnup v. Timm,
 
 502 U.S. 410, 419, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992) (“[T]his Court has been reluctant to accept arguments that would interpret the Code ... to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.”).
 

 Based on all of this, we hold that § 1322(c)(2) does not permit the bifurcation
 
 *514
 
 of an undersecured loan into secured and unsecured claims if the only security for the loan is a lien on the debtor’s principal residence. Because the Witts’ bankruptcy plan proposed such a bifurcation, United’s objection to the plan was well taken.
 

 We recognize that the effect of our decision will require the Witts to pay back the full amount of their home mortgage loan, making it harder for them to get “a fresh start in life, after they have made a good-faith attempt to pay what they can.”
 
 Report
 
 at 32. As Justice Stevens recognized in
 
 Nobelman,
 
 “[a]t first blush it seems somewhat strange that the Bankruptcy Code should provide less protection to an individual’s interest in retaining possession of his or her home than of other assets.”
 
 Nobelman,
 
 508 U.S. at 332, 113 S.Ct. at 2111 (Stevens, J., concurring). Permitting the bifurcation of home mortgage loans, however, could make lenders more hesitant to make such loans in the first place. Although a broader reading of § 1322(c)(2) might help the Witts today, it could make it more difficult in the future for those similarly situated to the Witts to obtain any financing at all. Congress appears to have designed another important section, § 1322(b)(2), with this result in mind.
 
 See id.
 
 (stating that § 1322(b)(2)’s “legislative history indicat[es] that favorable treatment of residential mortgagees was intended to encourage the flow of capital into the home lending market”);
 
 Perry,
 
 945 F.2d at 64 (finding that § 1322(b)(2) “was intended to make home mortgage money on affordable terms more accessible to homeowners by assuring lenders that their expectations would not be frustrated”);
 
 Grubbs v. Houston First Am. Sav. Ass’n,
 
 730 F.2d 236, 246 (5th Cir.1984) (noting that the exception for home mortgages in § 1322(b)(2) “was apparently in response to perceptions, or to suggestions advanced in the legislative hearings ... that[ ] homemortgagor lenders, performing a valuable social service through their loans, needed special protection against modification thereof (i.e., reducing installment payments, secured valuations, etc.)”).
 

 Even though we conclude that it does not permit bifurcation, § 1322(c)(2) still provides significant relief for homeowners in Chapter 13 who need more flexibility in paying off their mortgage loans. As many bankruptcy courts have already recognized, § 1322(c)(2) will serve primarily to “permit[ ] debtors to cure [maturing] obligations by paying the remaining part of the debt over the life of a Chapter 13 plan.”
 
 In re Nepil,
 
 206 B.R. 72, 76 (Bankr.D.N.J.1997);
 
 see also In re Watson,
 
 190 B.R. 32, 37 (Bankr.E.D.Pa.1995) (“[T]he obvious purpose of § 1322(c)(2) was to serve as the antidote for the theory that § 1322(b)(2) barred the cure of a residential mortgage obligation which matured prepetition.”);
 
 In re Escue,
 
 184 B.R. 287, 292 (Bankr.M.D.Tenn.1995) (concluding that under § 1322(c)(2) “Congress intended for debtors to be able to cure ‘stub’ or ‘short-term’ mortgages which mature or balloon prior to filing of the petition”). It is clear, therefore, that this repayment flexibility will be an important tool for debtors in restructuring the payment of home mortgage debt in Chapter 13 plans.
 
 See In re Chang,
 
 185 B.R. 50, 53 (Bankr.N.D.Ill.1995) (noting that § 1322(c)(2) “enables debtors to retain their homes for a few additional years and may enable them to sell their homes at a more favorable economic time, obtain replacement financing, or hope that their economic circumstances change for the better so that they may pay off the mortgage debt.”). We are certain, however, that Congress did not intend to permit bifurcation as yet another tool of restructuring this category of debt.
 

 III.
 

 In sum, § 1322(c)(2) does not trump § 1322(b)(2) (and Nobelman) to allow bifurcation of an undersecured home mortgage note. The dis trict court’s reversal of the bankruptcy court’s order overruling United’s objection to the Witts’ Chapter 13 plan is therefore
 

 AFFIRMED.
 

 [1]
 

 . The last payment on the original note was scheduled for October 1, 1999, while the last payment under the Witts' plan would be due on April 13, 2000.
 

 The Witts do not dispute that their mobile home qualifies as "real property that is the debt- or's principal residence.” The district court found that the home, which is “apparently attached to real estate,” was considered real property under Virginia law.
 
 Witt,
 
 199 B.R. at 892 n. 4.
 

 [2]
 

 . Under § 1325(a)(5), a Chapter 13 bankruptcy plan can only be approved if it meets one of three conditions with respect to each "allowed secured claim”: (A) the holder of the claim has accepted the plan; (B) the holder both retains its lien and receives property worth at least the allowed amount of the claim; or (C) the holder is given the property securing the claim. The Witts contend that the term "allowed secured claim” must be interpreted according to § 506(a) to mean only that portion of the claim which is equal to the current market value of the underlying collateral. Under such an interpretation, the requirement of § 1325(a)(5)(B) is met as long as the holder of the claim would receive the value of the claim that was still secured
 
 after
 
 bifurcation. Because the Witts’ plan provides for full payment of the portion of United's claim that is still secured after bifurcation
 
 (i.e.,
 
 $13,100), it would meet the requirements of § 1325(a)(5)(B) as interpreted by the Witts.
 

 [3]
 

 . United also argues that even if the "as modified” phrase does apply to “claim,” the Witts are not allowed to bifurcate under § 1325(a)(5). According to United, "allowed secured claim” should not be defined by § 506(a); instead, it should be interpreted to mean the full value of the remaining obligation on a secured note. We do not reach this issue because we resolve this case based on our interpretation of § 1322(c)(2).
 

 [4]
 

 . Several courts have found this passage in the Report to be "puzzling,”
 
 In re Jones,
 
 188 B.R. 281, 282 (Bankr.D.Or.1995), and "inconclusive,”
 
 In re Young,
 
 199 B.R. 643, 653 (Bankr.E.D.Tenn.
 
 *513
 
 1996), because of the supposed disjunction between the facts in
 
 Perry
 
 and the language of § 1322(c)(2). Section 1322(c)(2) only applies to debtors whose last payment to the creditor under the terms of the original contract falls due before the last payment is due under the bankruptcy plan. The facts in
 
 Perry
 
 do not discuss the payment schedules of either the original contract or the plan. The
 
 Jones
 
 court found it "strange[ ]” that "there is nothing in the
 
 Perry
 
 opinion which even hints that by the original terms of the parties’ contract the mortgage debt would have matured during the life of the proposed plan.”
 
 Jones,
 
 188 B.R. at 283;
 
 see also Young,
 
 199 B.R. at 652-53 (citing
 
 Jones
 
 and finding that "[a]t a minimum, the legislative history is inconclusive”). We do not understand why this disjunction would be puzzling. The Report clearly says that the changes made by § 1322(c)(2) "overrule the result in [
 
 Perry
 
 ] with respect to mortgages on which the last payment on the original payment schedule is due before the date on which the final payment under the plan is due.”
 
 Report
 
 at 52. Thus, the Report recognizes that § 1322(c)(2) only overrules
 
 Perry
 
 as it would apply to a subset of cases, namely, cases in which payments under the plan extend beyond the original payment schedule. Whether
 
 Perry
 
 itself involved the exact situation remedied by the new provision is irrelevant.
 

 [5]
 

 . We recognize that by enacting § 1322(c)(2), Congress intended to create a limited set of exceptions to § 1322(b)(2), and these exceptions do conflict with Nobelman's general characterization of the protections afforded by § 1322(b)(2) before § 1322(c)(2) was put into the Bankruptcy Code.
 
 See Nobelman,
 
 508 U.S. at 331, 113 S.Ct. at 2111 (noting that mortgage lenders have contractual rights as to the timing and amounts of payments). However, the holding of
 
 Nobelman
 
 is that debtors cannot bifurcate their home mortgage loans under § 1322(b)(2), and the Court based this holding on the text of § 1322(b)(2).
 
 Id.
 
 ("It is plausible, therefore, to read 'a claim secured only by a [homestead lien]' as referring to the lienholder's entire claim, including both the secured and unsecured components of the claim.” (quoting 11 U.S.C. § 1322(b)(2))).
 

 [6]
 

 .
 
 See Report
 
 at 37 & n.3 (listing cases overruled by § 103 of the Act); 39 & n.6 (listing cases overruled by § 110); 41-42 & n. 9 (listing cases overruled by § 112); 42 (noting that § 113 overrules two Supreme Court cases); 44-45 & n.ll (listing cases overruled by § 202); 45 & n. 12 (listing cases overruled by § 205); 46-47 (noting a case overruled by § 210); 47 (noting a case overruled by § 213); 47 — 48 (discussing cases overruled by § 214); 48-49 & n.17 (listing cases overruled by § 215); 52 (noting that § 301 overrules
 
 Roach
 
 and Perry); 52-53 (discussing cases overruled by § 303); 55 (noting a Supreme Court case overruled by § 305); 57 (discussing a case overruled by § 311); 58 (discussing a case overruled by § 313); 58 & n.20 (listing cases overruled by § 401); and 59 & n.21 (listing cases overruled by § 402).